## 6217. MORGAN *v.* LAMB, receiver.

1. The first grant of a new trial does not exhaust the discretion of the trial judge relatively to the grant or denial of another trial, where it appears from the record that the evidence in support of the verdict was weak and unsatisfactory, or the decided preponderance of the testimony was on the side of the losing party; but in the second grant of a new trial that discretion is not so ample and must be exercised with great caution.

2. The trial judge did not abuse his discretion in granting a new trial, notwithstanding the verdict complained of was a second verdict in favor of the same party.

DECIDED JUNE 25, 1915.

Action for damages; from city court of Waycross—Judge McDonald. November 19, 1914.

*Parker & Walker,* for plaintiff.

*Bolling Whitfield, J. L. Sweat,* for defendant.

WADE, J.  This was an action by a father for the homicide of his son.  The son was a negro boy, 16 years of age at the time of his death.  The sole witness in behalf of the plaintiff as to the manner in which the deceased met his death was James B. McCrary, who testified, that he himself was on a train of the defendant railway company going from Waycross to Bolen station, and that between Haywood (another station) and Bolen, he saw the deceased come into the negro coach and approach the "news butch," who sold newspapers, candy, and various other things on the train, and stand there talking for a time, but did not see him purchase any merchandise, though he had some money in his hand at the time; that the conductor and the porter started to enter the white coach, but seeing the deceased, Ira Morgan, they turned in haste, and one of them caught the boy by his shirt-sleeves and shoved him out of the door; that the conductor, whose name was Morris, and the porter, Ernest Montgomery, caught the boy by the sleeves immediately after entering the colored coach, and went out of the front door of the coach "and shoved him off and came back into the colored coach," and the conductor said, "That damn negro don't mind hitting the cross-ties," and the porter laughed; that he saw the porter catch the deceased by the "neck of his collar and shove him off;" that he (the witness) got up on the side of the seat he was sitting on and leaned through the window and could just get a glimpse of the porter's hand, and saw the boy going off just as he fell from the train; that the train was running pretty fast, and that when the deceased fell from it he burst his head open; that this happened about three quarters of a mile from Haywood station, and the witness was sitting at the time on a seat with a man named Ben Smith,—the witness on the left side next to the passage between the seats, and Ben next to the window.  On cross-examination this witness was interrogated as to his testimony at the coroner's inquest, and he admitted that he did not then tell all he was now telling, though he said the oath had been administered to him from a certain book, and it later appeared that the oath so administered was to tell "the truth, the whole truth, and nothing but the truth."  He explained that he had been advised by a girl with whom he was "going," as well as by other apparent friends of his, that the less he had to say about the matter the better it would be for him, and therefore he "told only a little to the cor-

oner and his jury" when sworn as a witness there, and "held back the balance of [his] testimony," though he said that if not mistaken, he had answered all the questions asked him at the inquest. There was testimony from the father of the deceased that he saw his son's dead body, and found the head "broken in and his brains knocked out;" that Haywood station, where it appears the boy entered the train, was a flag-station only, and no tickets were sold there; that when he reached the body of his son there were two nickels lying by the body, which would have been sufficient to pay for a ticket from Haywood to Bolen, but he did not know what money the boy had, as he was not there and had not seen his son in a week, and he knew nothing about the occurrence; that the boy earned $1.50 per day and helped to support him and his family; that he boarded his son free of charge, and bought the boy's clothes, as he received all of his son's wages.

The coroner who held the inquest testified, that the body of the deceased was found lying with the head about one or two feet from the end of the railroad cross-ties, and with the feet towards the ditch, and the head was bruised badly on the side of the forehead and broken in, and he saw signs indicating where the head hit the end of the ties near which the body was lying; that a can of "Prince Albert tobacco," a package of baking-powders, a cap, 10 cents in cash, a handkerchief, and a pocket-knife, were found with the body; that he assumed that the death had been brought about by a fall from the train, for the reason that the body was found by the railroad-track and no other cause was known; that at the inquest the witness McCrary testified that Ira Morgan got aboard the train and "went to the news butch and seemed to buy something; then, after the train started and left Haywood for some distance, walked to the platform like he was going to get off;   .   . the conductor and porter were behind him;" that when the conductor and porter came back again through the car, he heard them say, "That negro must not mind getting off a train;" that he was familiar with the construction of railroad-coaches, and it was impossible to look through an A., B. & A. passenger-car window and see what was going on on the steps of the coach in front of him; that he had noticed a little strip of iron just outside of the coach windows about three or four inches wide, and that if a man sitting inside the coach went to look out of a window, he would have to

put his head far enough out to look around the strip of iron to see what was going on in front of him, and it was only possible to raise the A., B. & A. windows half way; that when McCrary was questioned before the coroner's jury and asked specifically if he knew anything more about the matter, he said he did not; that this was all he knew about it. The conductor, J. S. Morris, testified that he knew absolutely nothing about any negro who was ejected from the front end of the second-class coach by his porter Montgomery between Haywood and Bolen on Saturday night, July 26, 1914, the time the homicide occurred; that no one, so far as his knowledge extended, got off the train between those two points, and there was no truth in the allegation that he and his porter forcibly, maliciously, and in violation of the rights of Ira Morgan, ejected and threw him from the passenger-train at a point about a quarter of a mile above Haywood station, when the train was running at the high rate of 20 miles per hour; that he was conductor in charge of that particular train, and did not remember seeing such a negro as the deceased on the train that night at all; that a person looking out of a window in one of the coaches on this train and around the window-shields, projecting from the side of the windows to keep cinders out, "would have to get his head out a pretty good ways to see around" the shields, and he did not think a person could see what was happening on the steps of the car in front of him, unless he got his head and shoulders out of the window; he did not believe he could see in front at all; that a person so situated could not see what was happening on the platform of the coach; that a man sitting inside the coach could not see what was happening on the platform of the car; that one passenger, a Mr. Robinson, got on at Haywood and went into the second-class car, and that he himself stood in the aisle of the car all the way from Haywood to Bolen, talking to Robinson; that he did not know why Robinson went into the negro coach, as he did not ask Robinson, but Robinson had a sack with him and was in his shirt-sleeves, and there were no negroes in that part of the car where he and Robinson were talking, though there were five or six in the other end of the car; that he did not sit down in the negro car, or in the end where the negroes were, and there was a partition between the place where he and Robinson were and the main body of the car.

Ernest Montgomery, the porter, testified, that he did not remem-

ber a man or negro boy getting on at Haywood, and that he and Captain Morris did not talk with anybody at the news stand on the train that night; that Morris did not have a dispute with any person about his fare between Haywood and Bolen, and that he did not help the conductor put a negro off the car, nor did he put his hands on anybody's collar or coat that night in the colored coach between Haywood and Bolen; that nothing at all happened that he knew of, as they did not stop between Haywood and Bolen; that it is not quite three miles from Haywood to Bolen, and when the train left Haywood he went into the white coach to see if there were any windows up (as he had instructions from the superintendent to keep the windows down, in order to keep cinders off the seats), and then went into the second-class coach, remaining there until the train blew for Bolen; that he did not know whether the conductor went into the white coach between Haywood and Bolen or not, and that he himself did not go to the front end of the second-class coach that he knew of, as he was back in the first-class coach; that two or three colored passengers got on at Haywood, but he did not know whether they went into the car to buy cigarettes or cigarette-papers or not, or what they got on the train for, and they may have kept on going across the platform and may not have stayed on the train at all, as they got on the front end and he was standing there at the time they got on, and when the train left he went back through the car but did not remember seeing them; that after they went up the steps, he did not know whether they went into the car or got off.

G. R. McLeroy, baggage-master of the train, testified, that he was in the baggage-car on the night when the deceased was killed, and his car was next to the second-class coach, but he could not say whether the door opening from his car on the platform of the car was open, though there was such a door that generally stayed open, between his car and the negro car; that after leaving Haywood that night he neither saw nor heard any struggle, and he did not see the conductor or porter putting off a passenger from the train between the colored coach and his coach; that if such a thing had happened at or near Haywood, he would have seen and heard it, and it would have been impossible for him not to see and hear it if it had happened; that he was back in the car several minutes after the train left the station, and when they pulled away from

Haywood the door was open, though it was possible it may have blown shut later and have been closed between Haywood and Bolen; he did not know whether it was open all the way or not. J. B. McCorkle testified that he had no connection with the defendant company or its receivers, but was a news-agent on the A., B. & A. passenger-train leaving Waycross for Atlanta, on which Captain Morris was conductor, on Saturday night, the last of July, 1913; that the railroad company allowed him four seats in the front of the second-class coach, in which he put his stock of merchandise for sale; that on the night referred to, conductor Morris did not take a negro man or boy from his seat in that car or from the second-class car with the help of the porter, and carry him and put him off the car between Haywood and Bolen stations; that no negro between 16 and 18 years old came to his stand in the car to buy something and was taken away from that place; that, to the best of his recollection, some one bought a package of cigarettes or cigarette-papers on leaving Haywood, but no one disturbed this person and he went back behind, "somewhere back the other way, walked back and sat down, and nobody bothered him at all;" that if any one had got on at Haywood that night he would not have known anything about it, because he paid no attention to who got on or off; that after this negro bought the cigarettes from him, he went back and sat down back of his stock in the car, but the witness could not say whether this was the negro killed or not, and he did not know where this person got on the train, whether he got on at Haywood or was already on when they reached Haywood; that this was the only negro he remembered coming to him at or near Haywood to buy something, and he did not remember if any one got on the train at Haywood; that the reason he remembered the circumstances connected with this particular trip was that the next morning, on his trip back to Waycross, some one told him a negro had been killed at Haywood that night, and he then remembered that a negro purchased some cigarettes from him at Haywood on the same night; that he did not sell anything else that he could recall; that he did not sell the dead negro the package of baking-powders and package of "Prince Albert tobacco," as he could not have got any of these things from him.

J. E. Robinson testified, in behalf of the defendant, that he knew Morgan, the deceased, and saw him at Haywood station on

the night of July 26, 1913, and, shortly before the train arrived
at the station, Morgan came to him to borrow 50 cents to get to a
place called Beach, and when he refused to let Morgan have it
Morgan turned off and said he could "beat the blinds that far;"
that he did not see the deceased again that night, and when the
train came he himself entered it, expecting to go into the white
smoker, in the rear of the colored coach, but went into the smoker
in the colored coach by mistake, and, when the conductor told him
he was in the wrong coach, he replied that the coach would answer
for a man as black and dirty as he was, and remained there; that
he paid the conductor his fare in cash, and the conductor gave him
his change and stayed and talked with him for some distance after
giving him his receipt slip, and, when the train blew for Bolen,
the conductor turned away and said that he might have another
ticket to take up, and he had better see about it; that "Captain
Morris and the porter did not go up to Ira Morgan and take hold
of him and force him ahead of him and through the front door of
the car next to the baggage-car, and there thrust him off of the
moving train. . . It did not happen, couldn't have happened,
for if it had, I would have seen it. The conductor was standing
there talking to me and fixing my slip, and he couldn't have been
in two places. If he had not been there with me, if such a thing
had happened I would undoubtedly have seen it;" that he did not
know whether Ira Morgan borrowed from some one else the money
which Ira asked him to lend.

Tuten, Summerlin, and Colson all testified that they were mem-
bers of the coroner's jury that held an inquest over the body of
Ira Morgan, said to have been killed at Haywood on July 26, 1913,
and all said that they remembered the testimony of James Mc-
Crary, the witness who testified that the conductor and porter
ejected Morgan from the train; that McCrary testified at the in-
quest that he did not hear the conductor and the Morgan boy have
any conversation at all, as the boy walked out of the coach ahead of
the conductor and the porter, and when the two last walked back
into the coach, one or the other said, "That negro don't mind
jumping from a train, do he?" or "He don't mind jumping off of
a train," or "That negro don't mind jumping off of a train." E. C.
Davis, the foreman of the coroner's jury, testified, that he heard
McCrary testify at the inquest, and that McCrary then said that

Morgan came into the end of the car at Haywood and stopped where the "news butch" was and talked to him, but if the deceased bought anything he did not see it, and, after the train left the station a short distance, the conductor and the porter came through, and when they got within about 10 feet of where Morgan was, Morgan turned and walked out of the door, and that was the last McCrary saw of him; that in response to a question whether "they had any trouble or any words," McCrary said they had not; that Morgan went out of the door and that was the last he saw of Morgan; and when McCrary finished his statement, he was asked whether that was all he knew, and he said it was; that other members of the jury asked him some questions; that the reason McCrary was summoned as a witness was because he was the only witness whose name they had who was on the train or saw the boy in the train, as the train had gone on and they could not get the train crew at that time, and they wished to ascertain if possible the cause of the death of the deceased. A copy of the oath administered to the witness McCrary and the Carlisle mortality tables and the annuity tables were introduced.

On this evidence the jury returned a verdict for $5,000 in favor of the plaintiff. A motion for a new trial was made on various grounds, among others the ground that the verdict was against the overwhelming weight of the evidence; and the trial judge, in granting the motion, passed the following order: "At chambers, Waycross, Georgia, November 19, 1914. The motion for a new trial in the above-stated case, by orders previously granted, was heard on the 16th day of November, 1914, and the decision thereon held up until to-day. There have been two verdicts in this case. The first verdict was for the plaintiff and for the sum of $100, and on motion of the plaintiff that verdict was set aside. The present verdict is for the plaintiff and for $5,000, and the motion for a new trial is made by the defendant. The facts in each trial were practically the same. The plaintiff has voluntarily written off $1,500 from the last verdict, reducing the amount to $3,500. The court has gone over this case very carefully and given every consideration to it. The court is not satisfied with the verdict, and is especially dissatisfied with the evidence upon which it rests. The plaintiff's right to recover can not be sustained without the evidence of James B. McCrary, and this witness's evidence is so contradictory and

wavering in character that the court is not satisfied to sustain the finding thereon without further corroboration. Therefore the court, after mature deliberation, has concluded to grant the motion for new trial, filed by the defendant in this case, and.the verdict and judgment heretofore rendered in said case is hereby set aside and annulled, and a new trial in said case hereby granted and ordered. [Signed] John C. McDonald, Judge of city court of Waycross." It will be noticed the order recites that the first verdict in behalf of the plaintiff was for $100 only; and the record discloses that on the first trial of the cause, the jury rendered a verdict in favor of the plaintiff for that amount, and that on his motion it was set aside, and a new trial was granted on the ground that the amount of the verdict was too small and was for this reason contrary to the evidence introduced in the case; and it further appears that, pending the present motion for a new trial and before the rendition of the judgment granting the motion, the plaintiff, by his attorneys, voluntarily wrote off from the amount of the verdict the sum of $1,500, thereby reducing it to $3,500.

The plaintiff excepted to the judgment setting aside the verdict and granting a new trial, and insists that the verdict was authorized by the evidence, and that, since the right to a recovery upon the part of the plaintiff had been established by the verdicts of two separate juries, the court had no legal discretion to set aside the recovery; that the question as to the sufficiency of the evidence and the character of the evidence was for the consideration of the jury; that the court fully charged the jury the law with reference to preponderance of evidence, impeachment of witnesses, and credibility of witnesses, and had no right to set aside the said finding of the jury upon questions of fact, since the judge's order recited that the evidence in each trial was practically the same.

1. It appears to be conclusively settled in Georgia that, notwithstanding the return of a second verdict in favor of the same party, the trial judge may still exercise his discretion in granting or refusing a new trial, though that discretion may not then be as ample as on the hearing of the motion for a first new trial. It was said in *Seaboard Air-Line Ry.* v. *Randolph,* 136 *Ga.* 505-507 (71 S. E. 887), that, "if it had appeared from the order of the court that it refused its approval of the verdict generally, but denied the motion for a new trial on the ground that the court had no discre-

tion, upon a second finding for the same party, where there was sufficient evidence to support it, we might feel constrained in this case to set aside this verdict, although it is a second finding in favor of the plaintiff, and for an amount substantially the same as the amount awarded in the first verdict, allowing interest on that amount to date of last verdict; because a trial court is not without discretion relative to the grant of a new trial after a second verdict in favor of the same party. In dealing with the second verdict his discretion may not be as ample as is that of a court hearing a motion for a first new trial. But certainly, under the decisions of this court, the first grant of a new trial does not exhaust the discretion of the court relatively to the grant or denial of another trial." And in the same case it was further said: "It is said in the case of *Dethrage* v. *City of Rome,* 125 *Ga.* 802 (54 S. E. 654), that 'after the first grant of a new trial, if the matter in controversy be one of fact for the jury, and for a second time in passing upon the same facts the verdict upon the question at issue be concurrent with the first, the mere discretion of the court can play but little part in the second motion for a new trial. It is true that it may sometimes be exercised, but only in cases where it is palpably apparent, from the entire evidence, that the verdict was strongly and decidedly against the weight of the evidence and manifestly wrong.' But even here there is no holding that the trial court is entirely divested of his discretion in the matter of granting a second new trial, and the language which we have just quoted should be considered in connection with the cases cited to support the proposition laid down. One of these is *Taylor* v. *Central Railroad Co.,* 79 *Ga.* 330 (5 S. E. 114). There it was said (p. 340) : 'From all that has been said and shown, we conclude that the power of the superior courts to grant new trials, being expressly conferred by statute, as well as arising from common-law principles (vide Code, sections 3711-3718), is not limited by any absolute and invariable rule as to the number of times of its allowable exercise, but that the presumption of the legality of such grant, generally speaking, weakens upon each additional concurrent verdict; and that a third, or even a second, grant of a rehearing on the ground of the evidence being decidedly and strongly against the verdict, will be carefully reviewed to see that the discretion to grant it has been justly, wisely, and prudently exercised, letting each case stand

as to this question upon its peculiar issues and facts, and allowing due weight to the general consideration of the fitness of juries to find the facts, and of the necessity that there shall be some end to litigation.'" In *Davis* v. *Chaplin,* 102 *Ga.* 587 (27 S. E. 726), the Supreme Court said: "This court will not reverse a judgment granting a second new trial on the ground that the verdict is contrary to evidence, when it appears from the record that the evidence in support of the verdict was at best weak and unsatisfactory, and the decided preponderance of the testimony was on the side of the losing party."

In *Taylor* v. *Central Railroad Co.,* supra, it appeared that a judge had granted the defendant below a new trial from an earlier verdict, and the question arose whether a second new trial could be allowed in such a case on the ground that the verdict was strongly and decidedly against the weight of the evidence. The court said: "This court has held, in cases too numerous for citation to be needful, that where there is any evidence to sustain the verdict, and the court below has refused the new trial, the judgment will not be reversed because the weight of the evidence is strongly and decidedly against it. It can not be denied that there was evidence on every issuable point in support of this verdict. We could not, therefore, grant a new trial, had the presiding judge refused to do so. The principle on which that rule is based may well be distinctly stated in this case. This court having no original jurisdiction, but being a tribunal for the correction of errors of law in lower courts, and the superior courts being, as a matter of original jurisdiction, clothed with discretion to pass upon motions for new trials (*Gay* v. *Parker,* 74 *Ga.* 407), a judgment granting or refusing a rehearing will be reversed only when this court can affirm that such judgment is contrary to law. The judge presiding below is justly recognized as enjoying superior advantages for insight into causes which control juries, and for estimating the value of testimony adduced before him, than the appellate court can have. A serious deference is, therefore, exercised by the reviewing court towards the lower one." In the same case (pp. 335, 336) it was said that "in behalf of a first grant of a new trial, the greatest deference has been uniformly shown. . . But how stands the second grant? The code says: 'In any case when the verdict is found contrary to evidence and the principles of justice

and equity, the presiding judge may grant a new trial.' Section 3713 [Civil Code of 1910, § 6082]. Again it says, in section 3717 [Civil Code of 1910, § 6088]: 'The presiding judge may exercise a sound discretion in granting or refusing new trials, in cases where the verdicts may be decidedly and strongly against the weight of evidence, although there may appear to be some slight evidence in favor of the finding.' Here, in the statute, is no limitation of the discretion conferred [as] to the first verdict. Wisely such limitation is omitted." The court still further said: "In *Johnson* v. *Renfroe & McCrary, 73 Ga.* 139, it is held that, 'where the motion for a new trial is grounded alone on the position that the verdict is contrary to the evidence and the law, . . the statute vests the discretion to grant or refuse a new trial, and unless that discretion be abused, this court has no legal power to interfere.' This language concerning the authority conferred by the statute is used without limitation to the first verdict. We find no case where it is adjudicated that the judge can not grant a second new trial because the *verdict is strongly and decidedly against the weight of the evidence"* (italics ours). The Supreme Court affirmed the judgment granting a second new trial in the *Taylor* case, supra, in which the only substantial complaint was that the court erred in granting a second new trial where the weight of the evidence was strongly and decidedly against the verdict returned. In *Christian* v. *Westbrook, 75 Ga.* 852, the Supreme Court intimated that the "discretion" to grant or refuse a new trial extends to the second verdict. In that case the second motion for a new hearing was denied below. The affirmance in the Supreme Court rested on the fact that the judge was satisfied with the verdict, and not on the ground that he could not have lawfully vacated it. In *Hazzard* v. *Savannah, 72 Ga.* 205, the Supreme Court affirmed a judgment granting a first new trial, and said "there was no abuse of discretion in granting a new trial on the ground that the verdict was not supported by the evidence, the case being quite a weak one on the evidence." The jury found for the plaintiff again on the second hearing, and increased the amount of recovery by $700. On the second hearing the judge granted another new trial. That judgment was reviewed in *74 Ga.* 377, and the Supreme Court held that "the presiding judge did not abuse his discretion in granting a second new trial."

It is true it was said by this court in *Scribner* v. *Mutual Building Co.,* 1 *Ga. App.* 527 (58 S. E. 240), that "where two verdicts have been rendered in favor of the same party on substantially the same issues of fact, and two new trials have been granted by the presiding judge, the rule of discretion applicable to the first grant of a new trial has no application; and if the evidence on the last trial, although conflicting, supported the second verdict, it should not be set aside." But, as already said, a different rule of discretion is applicable to the second grant of a new trial than the rule applied to the first grant, and what is quoted above in the *Scribner* case is not at variance with the numerous holdings of the Supreme Court on this question. It does not appear whether the verdict in that case was "decidedly and strongly against the weight of the evidence" or not; it appears merely that the evidence was "conflicting," and the court properly held that the presiding judge could not in the exercise of his discretion set aside a second verdict in behalf of the same party simply because there was a conflict in the evidence. In *Merchants & Miners Co.* v. *Corcoran,* 4 *Ga. App.* 654 (62 S. E. 130), this court said: "A second verdict, found with no evidence to sustain it, should be set aside as readily as a first, but a second verdict can not be set aside, as a first verdict might be, merely because upon the second trial the judge may think that the preponderance of the evidence is in favor of the losing party." This holding is not at variance with the several rulings made by the Supreme Court, since it does not appear in that case that the weight of the evidence was "strongly and decidedly" in favor of the losing party, even though there may have been an apparent preponderance in his favor. These last-named two cases are referred to in order to emphasize the rule, as laid down in the *Seaboard Air-Line Railway* v. *Randolph,* supra, that in dealing with a second verdict the discretion of the trial judge is not as ample as when hearing a motion for a first new trial, but, nevertheless, this discretion may be exercised in cases where it is palpably apparent, from the entire evidence, that the verdict was strongly and decidedly against the weight of the evidence, and, though the presumption as to the legality of the grant of a new trial because of the insufficiency of the evidence grows weaker upon each additional concurrent verdict, and the reviewing court must carefully investigate to determine if the discretion to grant a sec-

ond new trial has been justly, wisely, and prudently exercised, this court, in a case in which a second new trial has been granted on the ground that the verdict is decidedly and strongly against the weight of the evidence, or that the evidence is weak and unsatisfactory, will not reverse the judgment, where it does not appear that the trial judge abused his discretion in granting the second new trial. So, in conclusion, we may say on this point, that where the evidence in behalf of the prevailing party is "weak and unsatisfactory," notwithstanding the verdict may be the second verdict in his favor, the trial judge may in the exercise of his discretion set aside the verdict; or if, upon careful scrutiny by the reviewing court, it appears clear and unmistakable that the verdict is strongly and decidedly against the weight of the evidence, the reviewing court will not reverse the order of the trial judge, who in the exercise of his discretion has granted a second new trial, notwithstanding both verdicts have been in favor of the same party.

The only remaining question that it is necessary to determine in this case is whether the verdict which the trial judge set aside at the instance of the defendant was strongly against the weight of the evidence or was supported only by evidence that was in its nature weak and unsatisfactory. Of course this court could not itself set aside a verdict merely for the reason that the evidence sustaining it was weak and unsatisfactory, or because the verdict was against the weight of the evidence, since no such discretion is vested in us, but we may nevertheless examine the testimony appearing in a record and determine, from such an examination and from a careful review of the record, that the trial judge committed no abuse of discretion in determining that because the evidence was weak and unsatisfactory, and because the verdict was strongly against the weight of the evidence, the preservation of the just and lawful rights of the losing party in the court below demanded the grant of a second or a third or any number of new trials in the exercise of the discretion with which he is endowed by law. If it were otherwise, and a trial judge could not set aside a verdict which he believed to be contrary to law and the principles of equity, where no error is complained of except that the evidence does not warrant the verdict, litigants against whom there is strong prejudice at the time of the trial, with or without sufficient reason, would be wholly helpless and might be delivered bound into the

32

hands of their enemies or into the hands of any designing person who might take advantage of the existing prejudice. Of course we do not mean to say that any such state of facts existed in this case, but we refer to this merely to illustrate the possibilities if there was a hard and fast rule preventing a trial judge from exercising his discretion in the grant of a new trial, where previous verdicts have been in favor of the same party, since no other court is endowed with the power to guard against consequences arising from causes appearing at the trial which may be visible alone to the trial judge. On the first grant of a new trial, even though the verdict be strongly *supported* by the evidence or the weight of the evidence be in favor of the prevailing party, the trial judge may nevertheless, where no legal error has been committed in the admission or exclusion of testimony, in the instructions given to the jury, or in the conduct of the trial, grant a new trial solely because he does not believe that justice has been done, or feels that some miscarriage of justice has occurred. As was said by Judge Beck in *Seaboard Air-Line Ry.* v. *Randolph,* supra, the trial judge, in the second grant of a new trial, where the verdict has been both times in favor of the same party, must exercise his discretion with greater caution, since his discretion is not so "ample" then as in the granting of a first new trial; and so too the reviewing court must be satisfied that his discretion was exercised with great caution; but nevertheless, if the discretion be exercised on apparently good grounds, his action must be sustained.

2. We shall now consider whether or not the evidence in behalf of the prevailing party in this case was weak and unsatisfactory, or whether the verdict was strongly against the weight of the entire evidence adduced at the trial; and a mere inspection of the evidence, which is set out with considerable fullness in the statement of facts, must lead to the conclusion on the part of any unbiased mind that, assuming that the witnesses for the defendant in the court below were fairly credible, the decided preponderance of the testimony was against the verdict. The only evidence in behalf of the plaintiff was the evidence of McCrary, who admitted on the stand that he had been previously sworn at the coroner's inquest and at that time neglected to state all he knew as to the manner in which the deceased met his death, though it appeared the oath administered to him on that occasion required him not only to tell the

truth but the "whole truth," and his sole excuse for his refusal to give full information at the inquest was that he had been advised by certain personal friends of his that it might be better for him to reveal as little as possible. The conductor, the porter, and the newsboy on the train when the fatal occurrence took place disputed the testimony given at the trial by McCrary in every important particular and their testimony was corroborated by Robinson (apparently a wholly disinterested witness), who was a passenger on the train at the time, and who swore that he was in conversation with the conductor at the very time when McCrary, the sole witness for the plaintiff, testified the deceased had been violently ejected from the train by the conductor and the porter together. To cap all this, several witnesses who served at the coroner's inquest as jurymen testified at the trial that McCrary was then examined and stated that he did not know what occurred after he saw the deceased, Ira Morgan, go out of the door of the coach in which he was sitting, and that when asked if he knew anything else (though ample time was given him to add any other fact or detail within his knowledge), he replied that he knew nothing else. The baggageman also testified that while the door of his car may have been closed during part of the short journey between Haywood and Bolen, if any struggle had occurred on the platform as related by McCrary he would have heard it, and that nothing of the sort did occur.

While, of course, it was within the province of the jury to believe McCrary notwithstanding the evidence which tended to impeach him (as it was solely for them to say whether or not he had been successfully impeached), and to return a verdict based on his testimony, nevertheless, as the great weight of the evidence appears to have been against the truth of his testimony, the trial judge did not abuse his discretion in setting aside the verdict for the reason set forth in his order. In that order it is recited that the evidence of the sole witness upon whose testimony the verdict depended was in his opinion "so contradictory and wavering in character" that the court was not satisfied to "sustain the finding thereon without further corroboration." The judge, in setting aside the finding of the jury, did not base his ruling on the idea that there was only a preponderance of evidence in behalf of the losing party, or on the ground that the evidence was conflicting;

and hence his ruling was in no sense in conflict with the rulings in *Scribner* v. *Mutual Building Co.*, and *Merchants & Miners Co.* v. *Corcoran,* supra.

It will also be observed that while both verdicts in this case were in favor of the plaintiff, the first verdict was for $100 only, whereas the second verdict, based, as the trial judge certifies, on practically the same evidence as that adduced at the first trial, was for $5,000. The plaintiff moved to set aside the first verdict, and that motion was granted evidently on the idea that if the plaintiff was entitled to recover anything, he was entitled to recover more than $100 for the life of his son. The very fact that the jury returned on the first trial a verdict for so trivial an amount as the value of a human life indicates that the jury must have had a grave doubt as to the right of the plaintiff to recover at all under the evidence, and that they rendered this small verdict as a result of a compromise in the jury-room, or by way of charity extended to the plaintiff at the cost of the railroad company. In other words, the original finding was practically a finding in behalf of the defendant. The finding of $5,000 in favor of the plaintiff on the second trial was entirely out of harmony with the first finding, and was *decidedly* a finding in favor of the plaintiff. In fact it was so much a finding in favor of the plaintiff that his counsel voluntarily wrote off the sum of $1,500, and thereby reduced the amount thereof to $3,500, in order, apparently, to reduce the verdict to an amount supported by the evidence; and this act of counsel for the plaintiff amounted itself to a concession that the verdict for $5,000 was not authorized by the evidence, or was decidedly and strongly against the weight of the evidence, and of itself alone affords an additional reason in support of the conclusion, reached by the presiding judge, that the ends of justice would be subserved by setting aside even the diminished verdict and judgment.

In determining whether the evidence in behalf of the plaintiff was weak and unsatisfactory, or wavering and contradictory, and whether the verdict was decidedly and strongly against the weight of the evidence, the trial judge may have considered it in the light of human experience. He may have found that the statement that the conductor and porter, brutally and without regard for the almost certain consequences, forcibly ejected from a train, moving at a speed of 20 miles or more, one who failed or refused to

pay the insignificant sum of 10 cents as his fare to the next station, less than 3 miles away, was contrary to human experience, repugnant to all the probabilities, and too monstrously inhuman to be credible, and for this reason felt that the evidence of one witness was not sufficient to establish the fact, especially where that evidence was "contradictory and wavering in character," without the corroboration which could apparently be furnished on another trial if this witness in fact spoke the truth. According to the testimony, there were other passengers upon the train and in the particular coach from which the witness McCrary testified the deceased had been ejected, and diligence might discover one or more of these persons before the next trial, who must have seen some, if not all, of the same occurrence that McCrary testified that he saw, and who presumably would testify to the truth of the transaction, whatever that might be. It will be remembered that McCrary himself said that at the time the deceased was ejected from the platform of the car one Ben Smith was sitting on the same seat with the witness and next to the window, where from his position it appeared he could see even better than McCrary what happened outside of the car towards the front of the train. And also, according to McCrary's testimony, there were passengers in the other half of the colored coach, who may have seen something of what occurred and may be able to throw light upon the transaction, and either corroborate or refute what McCrary testified.

Other grounds of the motion for a new trial are not passed upon, since the manner in which the case comes to us for review precludes the necessity therefor, the new trial being granted by the trial judge entirely in the exercise of his discretion, and not because of any other grounds set forth in the motion.

*Judgment affirmed.*

RUSSELL, C. J., concurring specially. There are various expressions in the opinion in this case in which I can not concur, and I agree to the judgment of affirmance solely upon the ground that so far as the plaintiff in error is concerned, the grant of the new trial of which he complains is in effect the first grant of a new trial, and, under a well-settled rule, the exercise of the discretion of the trial judge in such case is not to be controlled.